**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

**IN AND FOR NEW CASTLE COUNTY**

|  |  |  |
|---|---|---|
| T & H BAIL BONDS, INC., TED L. PRIDGEN, ROBERT LUBACH, JOANNE M. LUBACH, MELISSA M. MATARESE, JERZY WIRTH AND WIRTH FINANCIAL SERVICES, LLC. | ) ) ) ) ) ) ) | |
| Plaintiffs (Judgment Creditor), | ) ) | C.A. No. N14J-01-761 (RRC) |
| | ) ) ) | Chancery Court, State of Delaware Judgment No. 55343439 |
| PREFERRED INVESTMENT SERVICES, INC., and EDWIN SWAN | ) ) ) ) | |
| Defendant (Judgment Debtor). | ) ) | |

Submitted: July 17, 2015
Decided: August 31, 2015

**COMMISSIONER'S ORDER ON PLAINTIFFS' MOTION FOR
WRIT OF FIERI FACIAS GARNISHMENT AND SANCTIONS**

Neil R. Lapinski, Esq., Gordon Fournaris & Mammarella, 1925 Lovering Ave., Wilmington, DE 19806. Attorney for Plaintiffs.

E. Calvin Harmon, Esq., 2207 Concord Pike, Ste. 153, Wilmington, DE 19802. Attorney for Defendant.

**MANNING**, **Commissioner.**

Before the Court are two motions. The first, writs of Fieri Facias Garnishment, were filed by T&H BAIL BONDS, Inc., *et. al.*, ("Plaintiffs") with the Superior Court on March 30, 2015 and April 16, 2015. The second, a motion for sanctions, was initiated when Plaintiffs filed a Motion for an Order to Show Cause why Defendant Debtor and Edwin Swan Should Not Be Held In Contempt And For Other Relief, on June 30, 2015.

## FACTS AND PROCEDURAL HISTORY

Preferred Investment Services, Inc., ("PISI") was a Delaware corporation involved in the financing of cash bails that were posted in various Delaware courts by T&H Bail Bonds, Inc. Edwin Swan was the owner and principal of PISI. Plaintiffs (in this action) are T&H and the other named individuals who were originally co-defendants in the Chancery Court case. The contract between PISI and T&H included exclusivity agreements regarding the financing of T&H's cash bails. Under the contract PISI would supply the necessary cash to T&H (the licensed bail bond agent who actually posted it with the court) for an upfront fee of one-half of the fee T&H charged to its customer (normally 33% of the total cash bail amount). Upon exoneration of the bail conditions (i.e. the case was dismissed or the defendant was sentenced and the case closed), the bail money would be picked up by T&H and returned to PISI. If the defendant absconded and the bail was forfeited, the loss was split 50-50. The other Plaintiffs in this action were alleged to have tortuously interfered with the financing agreement between PISI and T&H.

Eventually, however, the business relationship between PISI and the Plaintiffs soured. On October 8, 2010, PISI brought suit against Plaintiffs in Chancery Court alleging, *inter alia*, breach of contact. Plaintiffs made various counter-claims alleging the same thing. Following a three day trial in March of 2013, Vice Chancellor Parsons ruled against PISI on some of the

1

claims, awarding Plaintiffs $307,254.76 in fees and expenses in light of PISI's "bad faith" litigation.[1]

In an attempt to collect on this award, Plaintiffs filed a Judgment Complaint with the Superior Court on April 24, 2014.[2] Plaintiffs then sought a writ of Fieri Facias Garnishment directed against "Edwin J. Swan as President and Shareholder of Preferred Investment Services, Inc., 2201-A North Market Street, Wilmington, Delaware 19802." Plaintiffs sought to attach "money, goods, credits and effects, contract rights, all rights, personal property, including without limitation, trust distributions, accounts receivable and/or real estate belonging to Preferred Investment Services, Inc. or to which Preferred Investment Services, Inc. has a financial interest, in order to satisfy a debt owed to the above-named Judgment Creditor by the Judgment Debtor in the amount of $307,254.76 plus interest, according to judgment, in the Court of Chancery of the State of Delaware, Case Number 5886-VCP, Judgment Transaction ID 55343439." The writ stated that:

> "[a]s the Garnishee, you are to retain the items stated by you in response to the above. You are to hold the items, including retaining any scheduled trust distributions to the Judgment Debtor in the Trust, until another order of this Court releases you from this obligation. Among other things, this Attachment applies to any refunds of cash bails posted by A Bail Bond by Resto & Company, Above & Beyond Bail Bonds, Always on Time Bail Bond, Axe Bail Bonds, Bernard Boys LLC/Bad Boyz Bonds/Mark's Bail Bonds, Bail Bond Agency and Fast Bail Bonds, and specifically includes the point at which such distribution(s) is released from the Prothonotary but before it comes into the Judgment Debtor's possession."

PISI filed a motion to quash the writ on July 2, 2014.[3]

---

[1] A far more detailed statement of facts, and the allegations below, can be found in the excellent Chancery Court Memorandum Opinion. *See Preferred Investment Services, Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992 (Del.Ch. July 24, 2013); *aff'd Preferred Inv. Services, Inc. v. T & H Bail Bond, Inc.*, 2015 WL 258527 (Del. January 21, 2015).
[2] D.I. 1.
[3] D.I. 5.

On December 17, 2014, Plaintiffs filed 3 almost identical writs Fieri Facias Garnishment in each of the three Delaware Counties. The New Castle County writs were directed at:

A Bail Bond by Resto & Company, 1200 Northeast Blvd., Suite B, Wilmington, Delaware 19802;
Above & Beyond Bail Bonds, 94 Quigley Boulevard, New Castle, Delaware 19720;
Always on Time Bail Bond, 10 4th Street, Wilmington, Delaware 19801; Bail Bond Agency, 102 Larch Avenue, Wilmington, Delaware 19804; Bernard Boys LLC/Bad Boyz Bonds/Mark's Bail Bonds, 83 E. Cole Boulevard, Middletown, Delaware 19709;
Fast Bail Bonds, 1224 N. King Street, Wilmington, Delaware 19801; and
Prothonotary for the County of New Castle, 500 N. King Street, Suite 500, Wilmington, Delaware 19801.

Thus, in addition to attempting to attach any property or money owned by PISI, but in the possession of the individual bail bond agents, Plaintiffs wanted to attach bail "proceeds" held by the Prothonotary for exonerated cash bails that had not been returned to PISI by the posting bail agents.[4]

On January 23, 2015, Plaintiffs filed Interrogatories and Request for Production of Documents on PISI in Aid of Execution for the writs. On January 28, 2015, the Sheriff filed a Return of Service *Nulla Bona*, stating that he was unable to execute the writ on PISI. The Sheriff indicated that he spoke with Swan who stated that PISI was not located at the listed address and had no cash or property there.

On February 4, 2015, Plaintiffs filed a Motion For An Order to Show Cause Why Defendant or Judgment Debtor Should Not be Held In Contempt And For Other Relief. In this motion, Plaintiffs argued that Swan's statement to the Sheriff regarding PISI's assets was in

---

[4] The first problem with Plaintiffs' writ, as pointed out by the Court at oral argument on March 9, 2015, is that the Prothonotary does not know who financed any given bail. Rather, the Prothonotary only keeps a record as to which bail agent posted it by Criminal Action number and who it should be refunded to upon exoneration. Based on this, Plaintiffs filed new writs on March 30, 2015, directed at the Prothonotary, designating individual cases by Criminal Action number that it believed were financed by PISI.

3

direct contradiction to his sworn deposition testimony. Plaintiffs noted that Swan said that PISI previously used the location as a mailing address. When asked about his own trial testimony stating that PISI kept its cash on the premises, Swan said that those statements were false and that the only cash on the premises belonged to Preferred Tax Service, Inc.[5]

The Court issued the Rule to Show Cause notice on February 6, 2015. PISI filed a response to the Rule to Show Cause on February 9, 2015. A hearing before all parties was scheduled for March 4, 2015. During the interim, Plaintiffs filed a Motion to Compel PISI to comply with the January 23, 2015 Interrogatories and Request for Production. According to Plaintiffs' Motion to Compel, PISI had failed to respond in any way to the request within the allotted 30 days. Additionally, Plaintiffs' Motion to Compel alleged that PISI was simply stalling, using the delay to "[buy] time for Mr. Swan to resolve his litigation against [other] bail agents and fraudulently convert those cash bail refunds, thereby putting them beyond the reach of the Judgment Creditor."[6] Plaintiffs' Motion to Compel asked this Court to "enter an Order compelling PISI to answer the interrogatories fully and produce all documents responsive to the request for production and for all attorneys' fees and costs necessitated in the preparation, filing, and argument of this motion and enforcement of any resulting order."

Following a hearing before all parties on March 4, 2015, the Court entered an Order sanctioning PISI in the amount of $1,250.00 and requiring PISI to fully respond to Plaintiffs'

---

[5] Plaintiffs' Motion avers that Swan is also the owner of Preferred Tax Service, Inc., which was the registered agent for PISI according to Division of Corporations.

[6] Concomitantly, PISI had filed suit in the Superior Court in 2013 against bail agents that it had formerly done business with, alleging breach of contract and fraud, among other claims. *See PISI v. Fast Bail Bonds, LLC.*, *et al.*, N13C-03-039 ALR and *PISI v. Bail Bond Agency, Inc.*, N13C-07-370 ALR. Both cases were consolidated and subsequently dismissed on May 5, 2015.

discovery requests within 15 days—or face additional sanctions.[7]  PISI subsequently filed its answer to Plaintiffs' discovery request on March 19, 2015.[8]

Dissatisfied with PISI's discovery production, Plaintiffs filed the instant motion for sanctions (the now second Motion For An Order To Show Cause) on June 30, 2015.[9]  Plaintiffs' motion stated that PISI "answered the Discovery Request on March 19, 2015 by sending six PDF files to the undersigned via email asserting that '[t]he document production addresses is [sic] over 1,000 records.' "  Plaintiffs' attorney stated that he emailed PISI's attorney on March 30, 2015 asking for the Excel files in a "native" format so that they "might be put in some semblance of order."  Plaintiff stated he received no reply from PISI.  Plaintiffs sent another email on April 22, 2015, again asking for the same information, this email also went unanswered by PISI.

On March 30, 2015 and April 16, 2015, Plaintiffs filed new writs of Attachment directed to the Prothonotary of Kent and New Castle County, Superior Court. In these writs, Plaintiffs identified four cases, by Criminal Action number, where the cash bail was funded by PISI.[10]

Plaintiffs argue that the March 19, 2015, discovery production by PISI was so incomplete as to be virtually useless.[11]  The six spreadsheets that were provided (attached as Exhibit C to Plaintiffs' June 26, 2015 Motion) did not list sufficient information to allow individual cases or defendants to be identified—an intentional ploy by PISI according to Plaintiffs.[12]

On June 26, 2015, less than one week prior to the Rule to Show Cause hearing, PISI finally forward to Plaintiffs the native Excel spreadsheets in digital form.  Utilizing the

---

[7] D.I. 42.
[8] D.I. 44.
[9] D.I. 55.
[10] D.I. 45 and 47.
[11] D.I. 55 at 3.
[12] The data provided consisted of a list of last names, bail posting dates, bail amounts and a vague description of the court (i.e. "04/04/11, Alvarez, State, 225000"); no Criminal Action numbers were provided.  *See* Exhibit C to Plaintiff's Motion For An Order To Show Cause, Transaction ID 57466471, E-Filed June 26, 2015.

additional information already contained in the Excel data files, Plaintiffs were able to link the limited information provided to the associated Criminal Action numbers—the most critical piece of information.

Plaintiffs argue in their June 26, 2015 motion that PISI intentionally withheld this information "for over six month—six month which could have been used to identify bail monies to satisfy Plaintiff's [sic] judgment agaist [PISI]." PISI responded, via a letter from counsel on July 8, 2015, that the oversight "was [the] result of a mistake during the transfer of information from the two sources. When converting the Excel spreadsheets to PDF, my client's staff did not realize that the spreadsheets had two tabs and only converted the first tab. My client believed T&H had both tabs and did not understand why T&H could not find the information it sought. My client did not intentionally manipulate the documents nor did my client intend to deceive T&H from obtaining assets."

A hearing on the Rule to Show Cause motion was held before all parties in July 1, 2015. Counsel for PISI, and therefore Swan, was on notice that Plaintiffs were seeking sanctions against Swan personally for his actions on behalf of PISI in defiance of the discovery request and court order.[13] At the hearing, the Court heard argument from counsel for both parties and received documents into evidence. Swan was present but declined, thru counsel, to testify on behalf of PISI or in his own defense.

Following the July 1, 2015 hearing, both parties filed written submissions with the Court supporting their arguments. In sum, PISI asserted that no discovery violations occurred and, in any event, Plaintiffs have no legal right to attach bail proceeds that might be owned by PISI.[14]

---

[13] Plaintiffs' June 30, 2015, Rule to Show Cause motion urged this Court, as it has done in previous filings, to order the entire amount of the Chancery Court judgment of $307,254.76, plus interest, against Swan personally as a sanction for his actions as owner and principal of PISI.

[14] D.I. 61.

Plaintiffs argued that PISI intentionally and flagrantly violated discovery requests, a court order, and that Attachment of bail proceeds in the possession of the Prothonotary is permissible under Delaware law.[15]

## RULE TO SHOW CAUSE AND SANCTIONS

The Chancery Court judgment awarding $307,254.76 in fees and expenses against PISI—who was the plaintiff in that action—speaks volumes about PISI's deceptive behavior in pursuing this litigation. There is ample evidence that such deceptive behavior has continued in this Court as well—PISI has delayed and obfuscated at every turn in the proceedings in this case. PISI's March 19, 2015 discovery production to Plaintiffs was clearly calculated to comply with the Court's March 4, 2015 Order, but in form only. Based on the record before it, the Court has no doubt that PISI intentionally converted the Excel data into hard copy documents that omitted the corresponding Criminal Action numbers.[16] At the time the discovery was produced Plaintiffs were in the process of filing writs of Attachment that listed specific cases, by Criminal Action number, in an attempt to garnish the bail proceeds—something PISI, and therefore Swan, was well aware of. Without the Criminal Action numbers, Plaintiffs could not move to attach specific cases where the cash bail was financed by PISI before bail proceeds were returned to PISI.[17] Admittedly, Plaintiffs' January 23, 2015 interrogatories did not specifically request Criminal Action numbers. However, Plaintiffs' Request for Production of Documents did request

---

[15] D.I. 58 and 60.

[16] A reading of the Chancery Court Opinion results in a bad case of *déjà vu*; PISI employed the exact same method of deception there. When confronted with a discovery request by T&H for documents in their electronic format, PISI instead produced hard copies in a .pdf format. A subsequent forensic analysis of the electronic records revealed that the accounting records had been altered by PISI in an attempt to hide its duplicitous actions, before being printed. Further disconcerting is the fact that at the time of the Chancery Court trial PISI used Quickbooks, an accounting program which automatically tracks any changes made to the various data fields; Excel does not. *See* Chancery Court Op. at 17-18.

[17] Plaintiffs' argument that such a delay was an intentional delaying tactic to put money beyond their grasp is highlighted by the fact that once Plaintiffs had the native Excel data files they were able to identify cases where bail was picked up and returned to PISI in the intervening time (i.e. Crim. A. #s 1110006042 and 0507028126—cash bail totaling $15,000.00). *See* Plaintiff's Reply, July 15, 2015 at 3.

"all documents related to or reviewed in answering Interrogatory #1."[18] Thus, included in Plaintiffs' request was *all data* contained in the Excel data files—not just the portions specifically requested or what PISI chose to selectively print and send in response. By the end of the March 9, 2015 hearing and the Court's ruling on the matter, all parties were well aware that the Criminal Action numbers were the *sine qua non* of the case.

The fact remains, as the Court observed during the hearing, producing the Excel data files in a native or digital format is as easy as attaching it to an email and clicking the send button— which is ultimately exactly what PISI did.[19] The only reason, as far as the Court can see, for the need to convert the Excel data into paper documents was to filter and hide relevant information—which is also exactly what PISI did. PISI's counsel's statement that it was a mistake or oversight by PISI "staff" in converting the files is simply unavailing in light of the facts and PISI's previous similar conduct.[20] In fact, it was Swan himself, and not a member of his "staff" that signed the affidavit responding to the discovery request. The Court has no doubt that Swan knew why the information was sought and what information was necessary to identify specific cases—to characterize what PISI did as an "oversight" is dubious at best.

Plaintiffs have repeatedly urged this Court to sanction Swan personally for the full amount of the Chancery Court judgment. Plaintiffs cite to *Brandyco Enterprises, Inc. v. State* for the proposition that "the agent of a corporation may also be sanctioned for civil contempt, if he has the power to purge the contempt by causing the corporation to comply with the court's

---

[18] Under Plaintiffs' "Definitions" section, "document" included "electronic…records."

[19] *See* June 25, 2015 e-mail from Calvin Harmon, Esq., to Neil R. Lapinski, Esq., Exhibit F to Plaintiff's Motion For An Order To Show Cause, Transaction ID 57466471.

[20] During the Chancery Court preceding it came to light that it was Swan who *personally* altered the accounting books for PISI prior to the trial. As noted by the Chancery Court, "Swan's actions were misguided and wholly inappropriate. Indeed, his actions reflect a flagrant disregard or inexcusable ignorance of a litigant's obligation to preserve its documents, including its electronically stored information." *See* Chancery Court Op. at 70.

order."[21] However, *Brandyco* is not on point and, in fact, the Court actually stated that "I will assume that the agent of a corporation may also be sanctioned for civil contempt…." Read in context, the Court's statement in *Brandyco* is clearly an observation made in *dictum* and not a clear statement of legal authority. Additionally, the Court notes that the Family Court's Order at issue in *Brandyco*—imposing sanctions on the agent of a corporation for failing to issue a wage attachment—was *reversed* by the Superior Court.

Plaintiffs also cite to *Gallagher v. Long* for the proposition that a court may enter a judgment against a contemnor where he has demonstrated an element of willfulness or conscious disregard of the court's order.[22] While this is true as a general principle, the *Gallagher* opinion recognized this authority in the context of a civil dispute between *individuals* and the failure of one party to obey court orders for production and inspection of items; not the failure of a corporate owner/principal to cooperate with discovery orders.

Setting aside the fact that the Court views a sanction of over $307,254.76 as disproportionate, the Court is unable to sanction Swan directly for his actions on behalf of his corporation. Such an action would require this Court to "pierce the corporate veil," an equitable remedy the Superior Court lacks.[23] As noted by the *Gallagher* opinion, a court "has broad discretion to impose sanctions for failure to abide by its orders. However, the [court's] decision to impose sanctions must be just and reasonable. This Court has held that there must be an element of willfulness or conscious disregard of a court order before entry of judgment is warranted."[24]

---

[21] 1986 WL 2841, at *1 (Del. Super. February 4, 1986).

[22] 2007 WL 3262150, at *2 (Del. November 6, 2007).

[23] See *John Julian Const. Co. v. Monarch Builders, Inc*., 324 A.2d 208, 209 (Del. 1974) (Citing *Sonne v. Sacks*, 314 A.2d 194, 197 (Del. 1973) (Holding that the Superior Court lacks jurisdiction to 'pierce the corporate veil' against corporate officers or stockholders).

[24] *Gallagher*, 2007 WL 3262150 at *2.

Accordingly, based on the facts outlined above, the Court is compelled to impose sanctions on PISI for its willful, contemptuous and defiant behavior in this matter, pursuant to Superior Court Civil Rule 37(b)(2)(C)[25]. The Court will temper the sanctions requested and enter judgment against PISI for $30,700.00 USD. Upon review of the entire record of the proceedings in this matter and in light of the Court's prior sanction—which appears to have had little effect—the Court finds this to be a fair and just amount in light of PISI's failure to timely and completely respond to Court Orders and Plaintiffs' valid discovery request.

## WRITS OF FIERI FACIAS GARNISHMENT

In an effort to reach PISI assets Plaintiffs have filed various writs of Attachment. The only writ presently at issue is the one directed to the Prothonotary of the Superior Court. At present, an unknown number of cash bails are available to be picked up by the various bail agents PISI financed. As previously noted, the money was provided to the bail agents by PISI and upon exoneration of the bail conditions, was to be returned to PISI. Plaintiffs' writ asks the Prothonotary to intervene in this process by holding the money upon exoneration and turning it over to Plaintiffs in satisfaction of the judgment against PISI. Thus far, Plaintiffs have been able to identify a small number of cases where it claims the money was provided by PISI.[26]

PISI contends that Plaintiffs have not satisfactorily proven that the bails in question were financed by PISI, or that the Court has the legal authority to garnish the bail proceeds held by the Prothonotary.

---

[25] Rule 37(b)(2) Sanctions by Court. -- If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this Rule or Rule 35, the Court may make such orders in regard to the failure as are just… (C)…or rendering judgment by default against the disobedient party.
[26] D.I. 45.

10

A writ of Attachment Fieri Facias is governed by 10 *Del. C.* §5031.[27] The purpose of this writ is to execute upon a defendant's property which is not in his physical possession, but in that of another.[28] In practice:

> "[The] execution process requires the sheriff to attach the defendant by all his goods and chattels, rights and credits, lands and tenements in whose hands or possession, soever, the same may be found. Thus, when the property attached is not to be physically seized, but is in the possession or control of another, or if the thing to be attached is not such property as is susceptible of seizure, such as rights and credits, the sheriff must summon the person who has the goods, chattels, rights, credits, money or effects of the defendant in his possession, who is termed the garnishee, to appear at the court to which the writ is returnable, and declare what property of the defendant he has in his hands. Significantly, the writ of attachment fi. fa. is not served upon the defendant, but upon the garnishee."[29]

Additionally, "Attachment is a summary process in derogation of the common law and, therefore, the statute is to be strictly construed in favor of the party against whom the proceedings is employed, both as to the subject matter of the attachment and the method of enforcing the remedy."[30]

Under Delaware law, "[i]f any garnishee, duly summoned shall not appear as required, the garnishee may be compelled, by attachment, to appear and answer or plead."[31] Any failure by the Prothonotary, as garnishee, would expose the State to liability in the form of an Attachment against State property. Because the Prothonotary is an agent of the State of Delaware, the doctrine of sovereign immunity and 10 *Del. C.* §3503 is implicated.[32]

---

[27] "The plaintiff in any judgment in a court of record, or any person for him lawfully authorized, may cause an attachment, as well as any other execution, to be issued thereon, containing an order for the summoning of garnishees, to be proceeded upon and returned as in cases of foreign attachment. The attachment, condemnation, or judgment thereof, shall be pleadable in bar by the garnishee in any action against him at the suit of the defendant in an attachment...."

[28] 2 V. Woolley, Practice in Civil Actions and Proceedings in the Law Courts of the State of Delaware § 1152 (1906).

[29] *Wilmington Trust v. Barron*, 470 A.2d 257, 262-263 (Del. 1983) (internal citations omitted).

[30] *John Julian Const. Co. v. Monarch Builders, Inc.*, 306 A.2d 29, 33 (Del. Super. 1973) (Citing *Clark v. Foster*, 133 A.2d 601 (Del.Super. 1957).

[31] 10 *Del. C.* § 3509.

[32] 10 *Del. C.* §3503, Public officers and employees subject to attachment and garnishment.

Under the doctrine of sovereign immunity, the State cannot be sued without its consent.[33] However, the General Assembly has abrogated this doctrine in certain instances and allowed the State to be garnished. Per 10 *Del. C*. § 3503, such instances are limited to those in which the State has an obligation to pay wages to a state employee. Per the narrow language of § 3503, the State can only be subject to garnishment if it involves its "duty []to pay []employees compensation from funds of the State… ." Despite Plaintiffs' best arguments to the contrary, bail agents do not fit the definition of an "employee" as described under the statute—they do not "perform[] any and every form of labor and work for the State, county district or municipality for compensation."

Additionally, the bail money held by the Pothonotary is not "paid" to the bail bondsmen, rather, it is returned to him pursuant to contract. The funds deposited with the Prothonotary as bail are held in trust during the pendency of the case—the funds only become legal property of the State following a bail forfeiture proceeding.[34]

In *Mosaica Education, Inc., v. Academy of Dover, Inc*., one of the few Delaware cases to examine the issue, the Superior Court allowed garnishment of the State Treasurer under § 3503 for a debt owed by a charter school to a third party.[35] The Court reasoned that defendant (Academy of Dover) "as a charter school, certainly performs a service for the State—to wit, the

---

(a) The attachment laws of this State shall apply to employees of the State, or of any county, district or municipality with the same force and effect as they apply to other individuals. Any officer of the State, or of any county, district or municipality, whose duty it is to pay such employees compensation from funds of the State, county, district or municipality for any services rendered by such employees to the State, county, district or municipality may be summoned to appear and answer as other garnishees are required to do.

(b) The term "employee" as used in subsection (a) of this section includes any and every person performing any and every form of labor and work for the State, county, district or municipality for compensation.

[33] *See Doe v. Cates*, 499 A.2d 1175, 1176 (Del. 1985).
[34] Superior Court Criminal Rule 46(e).
[35] 2015 WL 1598049, *2 (Del. Super. April 07, 2015).

education of its young citizens. Moreover, in most contexts, unless otherwise specified, "persons" includes all legal entities, including charter schools."[36]

In contrast, bail agents do not work *for* the State—they merely work within the criminal court system providing a service that is intended to benefit only their client; the State's benefit is merely incidental. Unlike a charter school that receives money from the State to educate the State's children, a bail agent's compensation is in the form of fees paid by his clients, not the State.

Finally, as a matter of public policy, allowing creditors to attach bail proceeds would place undue burdens on the Prothonotary and interfere with the Court's primary function—the orderly administration of justice. Courts in other jurisdictions have long recognized this danger and held court clerks immune from garnishment proceedings by private creditors in similar situations.[37]

Therefore, despite the validity of Plaintiffs' claim against money legally owed to it by PISI, the Court is without authority to issue writs of Attachment against any State agency outside the parameters of 10 *Del. C*. § 3503.

---

[36] *Id*.

[37] *See A-1 Lithoplate, Inc., v. AFS Publishing Co.*, 384 N.E.2d 396, 387 (Ill. App. Ct. 1978) (Stating that "[w]e believe that the reasoning behind the general rule [] that bond funds in the custody of a court clerk are not subject to garnishment or attachment by private persons, is sound, and that public policy requires us to follow [such] precedent… . Holding otherwise might well result in cases where various judgment creditors struggled to win bail bond money. The consequences would be to throw the clerk into the middle of creditors' battles and increase the often-commented-upon delay and inconvenience in our court system.").

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for sanctions against PISI is hereby GRANTED in the amount of $30,700.00 USD; Plaintiffs' motion for a writ of Fieri Facias Garnishment against the Prothonotary is hereby DENIED.

**IT IS SO ORDERED.**


    /s/ *Bradley V. Manning*
BRADLEY V. MANNING,
Commissioner


oc:    Prothonotary
cc:    Defendant